## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Timothy R. Palchak, Detective with the District of Columbia Metropolitan Police Department being duly sworn, depose and state as follows:

1.      I have been a police officer with the Metropolitan Police Department in Washington, D.C. since 1994.   In 2000, I was promoted to Detective Grade 2 and am currently serving at this rank.

2.      During my fourteen year tenure with the Metropolitan Police Department, I have been assigned to the Third District Patrol Operations and Prostitution Enforcement Unit.  I am currently assigned to the Northern Virginia Regional Internet Crimes Against Children Task Force.  I have received the following training: Family Violence and Child Protection, Basic Investigator Course, Interview and Interrogation, Sexual Assault Nurse Examination, Children's Hospital Conference on Responding to Child Maltreatment, Child Abuse and Child Exploitation Investigation Techniques, Undercover Internet Crimes Against Children (ICAC) Investigations Course, and Image Scanning.

3.      I have made numerous arrests and interviewed numerous victims, witnesses, and suspects.  I have participated in numerous child abuse investigations, child sex abuse investigations, and ICAC investigations.   In November of 2005, I received cross designation training from Immigration and Customs Enforcement (ICE).

4.      As a federal agent, I am authorized to investigate violations of laws of the United States and is a law enforcement officer with the authority to execute warrants issued under the authority of the United States.

5.      This affidavit is being submitted in support of a search warrant for the entire premises located at 1315 Missouri Avenue, N.W. Apartment 201, Washington, D.C.  ("Subject Premises").

1

For the reasons set forth below, I believe that there is probable cause that evidence, fruits and instrumentalities of violations of federal child exploitation laws are located at the Subject Premises, including violations of Title 18, United States Code, Section 2252A.

6.      The statements contained in this affidavit are based on information provided by Detective Sergeant Earl Bock of the Internet Crimes Against Children (ICAC) Task Force in Pennsylvania, conversations held with federal law enforcement agents, information obtained from subpoenas and public databases, and my experience and background as a law enforcement officer. This affidavit does not set forth every fact resulting from the investigation; rather, it sets forth facts sufficient to establish probable cause to search the Subject Premises, more specifically described in Attachment B.

7.      For the reasons set forth below, I  submit that this affidavit contains ample probable cause to believe that the Subject Premises contains evidence, fruits or instrumentalities of federal child exploitation crimes, in violation of Title 18, United States Code, Section 2252A.

## PERTINENT FEDERAL CRIMINAL STATUTES

8.      Title 18, United States Code, Section 2252A, entitled "Certain activities relating to material constituting or containing child pornography," provides, in pertinent part:

(a) Any person who –

> (1) knowingly mails, or transports or ships in interstate or foreign commerce by any means, including by computer, any child pornography;
>
> (2) knowingly receives or distributes –
>
> any child pornography that has been mailed, or shipped or transported in interstate or foreign commerce by any means, including by computer; or

any material that contains child pornography that has been mailed, or shipped or transported in interstate or foreign commerce by any means, including by computer;

(3) knowingly reproduces any child pornography for distribution through the mails, or in interstate or foreign commerce by any means, including by computer;

. . . .

(5)(B) knowingly possesses any book, magazine, periodical, film, videotape, computer disk, or any other material that contains an image of child pornography that has been mailed, or shipped or transported in interstate or foreign commerce by any means, including by computer, or that was produced using materials that have been mailed, or shipped or transported in interstate or foreign commerce by any means, including by computer,

shall be punished as provided in subsection (b).

## DEFINITIONS

9.      Title 18, United States Code, Section 2256 defines the term "minor" as any person under the age of eighteen years.

10.     Title 18, United States Code, Section 2256(8) defines "Child Pornography" as "any visual depiction, including any photograph, film, video, picture, or computer or computer-generated image or picture, whether made or produced by electronic, mechanical, or other means, of sexually explicit conduct, where – (A) the production of such visual depiction involves the use of a minor engaging in sexually explicit conduct; . . . [or] (C) such visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaging in sexually explicit conduct."

11.     Title 18, United States Code, Section 2256(2) defines "sexually explicit conduct" as actual or simulated:

(a)      Sexual intercourse, including genital-genital, oral-genital, anal-genital, or

3

oral-anal, whether between persons of the same or opposite sex;

(b)    Bestiality;

(c)    Masturbation;

(d)    Sadistic or masochistic abuse; or

(e)    Lascivious exhibition of the genitals or pubic area of any person.

12.    Title 18, United States Code, Section 2256(5) defines "visual depiction" as including undeveloped film and videotape, and data stored on computer disk or by electronic means that is capable of conversion into a visual image.

13.    Computer as used herein, is defined pursuant to 18 U.S.C. § 1030(e)(1), as "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device."

14.    Internet Protocol address (IP address) refers to a unique number used by a computer to access the Internet.  IP addresses can be dynamic, meaning that the Internet Service Provider (ISP) assigns a different unique number to a computer every time it accesses the Internet.  IP addresses might also be static, if an ISP assigns a user's computer a particular IP address which is used each time the computer accesses the Internet.

15.    SHA-1 or Secure Hash Algorithm Version 1 is a file encryption method which may be used to produce a unique digital signature of a file.  The Secure Hash Algorithm was developed by the National Institute of Standards and Technology along with the National Security Agency.  The United States has adopted the SHA-1 hash algorithm as a Federal Information Processing Standard. It is computationally infeasible (i.e., $2 \wedge 160^{\text{th}}$) to find two different files that produce the same SHA-

1 value.  Thus, if two files have the same SHA-1 value, the contents of those files are the exact same,

regardless of the files' names.  Any changes in the name of the file or extensions will not result in

a change in the Hash value.  This 160-bit value acts as an electronic fingerprint for that particular

file.  There is no known instance of two different child pornographic images or videos having the

same SHA-1 hash value.

16.     The terms "records," "documents," and "materials" include all information recorded

in any form, visual or aural, and by any means, whether in handmade form (including, but not limited

to, writings, drawings, paintings), photographic form (including, but not limited to, microfilm,

microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies), mechanical form

(including, but not limited to, phonograph records, printing, typing) or electrical, electronic or

magnetic form (including, but not limited to, tape recordings, cassettes, compact discs, electronic

or magnetic storage devices such as floppy diskettes, hard disks, CD-ROMs, digital video disks

(DVDs), cell phones, Personal Digital Assistants (PDAs), Multi Media Cards (MMCs), memory

sticks, optical disks, printer buffers, smart cards, memory calculators, electronic dialers, Bemoulli

drives, or electronic notebooks, as well as digital data files and printouts or readouts from any

magnetic, electrical or electronic storage device).

## COMPUTERS AND CHILD PORNOGRAPHY

17.     Based upon my knowledge, training, and experience in child exploitation and child

pornography investigations, and the experience and training of other law enforcement officers with

whom I have had discussions, computers and computer technology have revolutionized the way in

which child pornography is produced, distributed, and utilized.  Prior to the advent of computers and

the Internet, child pornography was produced using cameras and film, resulting in either still

photographs or movies.  The photographs required darkroom facilities and a significant amount of skill in order to develop and reproduce the images.  As a result, there were definable costs involved with the production of images.  To distribute these images on any scale also required significant resources.  The photographs themselves were somewhat bulky and required secure storage to prevent their exposure to the public.  The distribution of these wares was accomplished through a combination of personal contacts, mailings, and telephone calls, and compensation for these wares would follow the same paths.  More recently, through the use of computers and the Internet, distributors of child pornography use membership and subscription-based websites to conduct business, allowing them to remain relatively anonymous.

18.    In addition, based upon my own knowledge, training, and experience in child exploitation and child pornography investigations, and the experience and training of other law enforcement officers with whom I have had discussions, the development of computers has also revolutionized the way in which those who seek out child pornography are able to obtain this material.  Computers serve four basic functions in connection with child pornography: production, communication, distribution, and storage.  More specifically, the development of computers has changed the methods used by those who seek to obtain access to child pornography in these ways:

a.    Producers of child pornography now can produce both still and moving images directly from a common video or digital camera.  The camera is attached, using a device such as a cable, or digital images are often uploaded from the camera's memory card, directly to the computer.  Images can then be stored, manipulated, transferred, or printed directly from the computer.  Images can be edited in ways similar to how a photograph may be altered.  Images can be lightened, darkened, cropped, or otherwise manipulated.  The producers of child pornography can

also use a device known as a scanner to transfer photographs into a computer-readable format.  As a result of this technology, it is relatively inexpensive and technically easy to produce, store, and distribute child pornography.  In addition, there is an added benefit to the pornographer in that this method of production does not leave as large a trail for law enforcement to follow.

b.      The Internet allows any computer to connect to another computer.  By connecting to a host computer, electronic contact can be made to literally millions of computers around the world.  A host computer is one that is attached to a network and serves many users.  Host computers are sometimes operated by commercial ISPs, such as America Online ("AOL") and Microsoft, which allow subscribers to dial a local number or otherwise directly connect to a network which is, in turn, connected to the host systems.  Host computers, including ISPs, allow e-mail service between subscribers and sometimes between their own subscribers and those of other networks.  In addition, these service providers act as a gateway for their subscribers to the Internet or the World Wide Web.

c.      The Internet allows users, while still maintaining anonymity, to easily locate (i) other individuals with similar interests in child pornography; and (ii) websites that offer images of child pornography.  Those who seek to obtain images or videos of child pornography can use standard Internet connections, such as those provided by businesses, universities, and government agencies, to communicate with each other and to distribute or receive child pornography.  These communication links allow contacts around the world as easily as calling next door.  Additionally, these communications can be quick, relatively secure, and as anonymous as desired.  All of these advantages, which promote anonymity for both the distributor and recipient, are well known and are the foundation of transactions involving those who wish to gain access to child pornography over

7

the Internet.  Sometimes, the only way to identify both parties and verify the transportation of child pornography over the Internet is to examine the recipient's computer, including the Internet history and cache to look for "footprints" of the websites and images accessed by the recipient.

        d.      The computer's capability to store images in digital form makes it an ideal repository for child pornography.  A single floppy or compact disk can store dozens of images and hundreds of pages of text.  The size of the electronic storage media (commonly referred to as a hard drive) used in home computers has grown tremendously within the last several years.  Hard drives with the capacity of 100 gigabytes are not uncommon.  These drives can store thousands of images at very high resolution.  Magnetic storage located in host computers adds another dimension to the equation.  It is possible to use a video camera to capture an image, process that image in a computer with a video capture board, and save that image to storage in another country.  Once this is done, there is no readily apparent evidence at the "scene of the crime".  Only with careful laboratory examination of electronic storage devices is it possible to recreate the evidence trail.

        e.      Computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet. Electronic files downloaded to a hard drive can be stored for years at little to no cost.  Even when such files have been deleted, they can be recovered months or years later using readily-available forensic tools.  When a person "deletes" a file on a home computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space – for long periods of time before they are

overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.  Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or cache.  The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages.  Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits.

## PEER TO PEER FILE SHARING SOFTWARE

19.     A growing phenomenon on the Internet is peer to peer file sharing (P2P).  P2P is a computer term used to describe one user linking with another user to transfer information.  P2P file sharing is a method of communication available to Internet users through the use of special software. Computers linked together through the Internet using this software form a network that allows for the sharing of digital files between users on the network.  A user first obtains the P2P software, which can be downloaded from the internet.  In general, P2P software allows the user to set up file(s) on a computer to be shared with others running compatible P2P software.  A user obtains files by opening the P2P software on the user's computer, and conducting a search for files that are currently being shared on the network.  Individuals share files from their computer's hard drive directly with other people over the Internet using P2P software.  Thus, each user's machine becomes a decentralized mini-server, as opposed to a centralized server, meaning there is no central database that knows all of the files available on the network.  Instead, all of the user's machines on the network tell each other about available files using a distributed query approach.  P2P file sharing has become a popular method to distribute images and videos containing child pornography.

9

20.     Gnutella was the first decentralized P2P network.  Because of the network's open nature, several clients emerged as the new leaders of Gnutella.  Two clients, BearShare and LimeWire, became the frontrunners in this open network.  Gnutella utilizes something called "super-peers" or "ultrapeers" to create temporary indexing servers that allow the network to scale to unparalleled heights.  Any user may become a super-peer or ultrapeer if his computer and Internet connection are powerful enough.  The Gnutella network uses SHA-1 values to identify files.  When a file is added to a user's library of shared files (either by downloading a file from another user or by copying any file into the shared directory), the client will create a SHA-1 hash value for that particular file.  The indexing of the files being shared on the Gnutella network is done through these ultrapeers.  When a person searches for a file, that search is conducted based on the keywords used. When a person uses keywords to search for an image/video, a Gnutella client software program such as "Phex" searches the ultrapeers for files which have those words in the filename.  "Phex" is a simple file-sharing program.  It allows a user to share and download any type of files from other users on the Gnutella network regardless of what client (i.e. Bearshare or Limewire) is used.

21.     A P2P file transfer is assisted by reference to an Internet Protocol (IP) address.  This address, expressed as four numbers separated by decimal points, is unique to a particular computer during an online session.  The IP address provides a unique location making it possible for data to be transferred between computers.

## CHILD PORNOGRAPHY COLLECTOR CHARACTERISTICS

22.     Based on my training and experience and conversations that I have had with other federal agents and law enforcement officers, I know that child pornography is not readily available in retail establishments.  Accordingly, individuals who wish to obtain child pornography do so

usually by ordering it from abroad or by discreet contact, including through the use of the Internet, with other individuals who have it available or by accessing web sites containing child pornography. Child pornography collectors often send and receive electronic mail conversing with other collectors in order to solicit and receive child pornography.

23.     I know that child pornography collectors usually maintain and possess their materials (computer images, pictures, films, magazines, videotapes, correspondence, source information, etc.) in a private secure location such as their home, office, or work space.  Images or videos taken off of the Internet are often stored in the hard drive of the computer or on diskettes kept in private locations near the computer such as in locked desks, shelves, contiguous work space, filing cabinets or similar items and areas in office space.  These images also can be printed on computer printers and maintained by child pornography collectors in paper form.  Additionally, child pornography collectors often transfer those images to videotape, either by videotaping with a handheld video camera the images or videos on a computer screen, or by connecting a video cassette recorder to the computer and recording the images or videos directly.

24.     Collectors of child pornography typically retain their materials and related information for many years.  Most collectors of child pornography seek to increase the size of their collections in a manner similar to collectors of coins, stamps, or rare books.  Many retain these materials, including information regarding sources, for their entire adult lives.  Moreover, individuals who distribute and/or collect child pornography generally prefer not to be without their child pornography for any prolonged time period.  This behavior has been documented by law enforcement officers involved in the investigation of child pornography throughout the world.  In addition, collectors of child pornography rarely destroy correspondence from other collectors or distributors

unless their activities are uncovered by law enforcement authorities or others.

25.     Even if a collector of child pornography images attempts to delete images from his computer, however, for example, by moving them to the "Recycle Bin" of a computer, those images usually remain intact on the hard drive of a computer, often for a long period of time, because information on a hard drive is not destroyed until it is physically overwritten with other data or erased from the hard drive.  As a result, even when a computer user thinks he or she has deleted data, in reality it usually remains on the computer and is recoverable.

26.     Accordingly, information in support of probable cause in child pornography cases is less likely to be stale because collectors and traders of child pornography are known to store and retain their collections for extended periods of time, usually in their home.  Indeed, as noted above, based on my experience with child pornography search warrants, I know that even where information about a suspect's use of child pornography is not current, we typically find child pornography at the location of the search, assuming the suspect still resides there.

27.     Additionally, based on my experience and training, I know that persons who collect and distribute child pornography:

        a.     Frequently collect sexually explicit materials in a variety of media, such as photographs, magazines, motion pictures, video tapes, books, slides and/or drawings or other visual media that they use for their own sexual arousal and gratification.  Further, they commonly use this type of sexually explicit material to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, and to demonstrate the desired sexual acts.

        b.     Frequently receive sexual gratification, stimulation, and satisfaction from actual physical contact with children and/or from fantasies they may have viewing children

12

engaged in sexual activity or in sexually suggestive poses (in person, in photographs, or other visual media) or from literature describing such activity.

      c.      Often correspond and/or meet others to share information and materials, rarely destroy correspondence from other child pornography distributors/collectors, conceal such correspondence as they do their sexually explicit material, and often maintain lists of names, addresses, telephone numbers and screen names of individuals with whom they have been in contact and who share the same interests in child pornography.

      28.      Based on my training and experience and my conversations with law enforcement agents, I have also learned that:

      a.      Child pornography is a permanent record of the sexual abuse of a child victim.  Each time child pornography is reproduced, downloaded, or forwarded by an Internet user, the victimization of the minor appearing in the pornography is perpetuated.  Such items also are important evidence and indications of an individual whose sexual objects are children, and of that individual's motive, intent, and predisposition to violate federal law related to the production, possession and distribution of child pornography.  Additionally, these items lead to the identification of child victims and other individuals engaging in similar conduct.

      b.      Child pornography collectors reinforce their fantasies, often by taking progressive, overt steps aimed at turning the fantasy into reality in some or all of the following ways: collecting and organizing their child-related material; masturbating while viewing the child pornography; engaging children, online and elsewhere, in conversations, sometimes sexually explicit conversations, to fuel and fortify the fantasy; interacting, both directly and indirectly, with other like-minded adults through membership in organizations catering to their sexual preference for

children thereby providing a sense of acceptance and validation within a community; gravitating to employment, activities and/or relationships which provide access or proximity to children; and frequently persisting in the criminal conduct even when they have reason to believe the conduct has come to the attention of law enforcement.  These are need-driven behaviors to which the offender is willing to devote considerable time, money, and energy in spite of risks and against self interest. The "collection" is the best indicator that law enforcement has of what the collector wants to do, not necessarily what he has done or will do.  The overriding motivation for the collection of child pornography may be to define, fuel, and validate the collectors' most cherished sexual fantasies involving children.

### PROBABLE CAUSE TO SEARCH THE SUBJECT PREMISES

29.     The facts tending to establish the grounds for this search warrant and the probable cause are as follows:

30.     On July 31, 2008, Detective Bock was using a commercially available computer software program to conduct pro-active undercover investigations regarding internet sharing of Child Pornography on the Gnutella network.  This activity was done as part of his duties with the Pennsylvania Internet Crimes Against Children Task Force.

31.     During the session Detective Bock used numerous search terms associated with child pornography to locate individuals on the network who were offering to share child pornography images and/or movie files.  Some of the search terms he used included: PTHC (Pre-Teen Hard Core), Baby J, and Hussyfan.  While searching the term "babyj" he  located a computer on the network which was offering to share a file that has been previously identified by the National Center for Missing and Exploited Children as child pornography containing an image or video of a known

14

victim of child sex abuse.  The title of this file is: "BabyJ-R@ck (55S) 5yo enjoys gentle fuck from very big dick (r@ygold style rca pedo 9yo child sex).mpg".   The SHA-1 Hash value is QMI4AGKPC36O5JD2ZM6ODZFREUI5WMBJ.

32.   Investigation revealed that the computer that was offering these electronic files for sharing was assigned IP (Internet Protocol) address 96.241.5.178.  Further investigation determined that IP address 96.241.5.178 is owned by Verizon Internet Services, and that the originating location of the computer offering this file was Washington, D.C.

33.   Detective Bock browsed the shared folder of the computer using IP address 96.241.5.178 and found that this computer had 390 files available to be shared, 53 of which were video files.  Detective Bock determined (based on the SHA-1 values) that 8 of the 53 video files have been previously identified by the National Center for Missing and Exploited Children as child pornography containing an image or video of a known victim of child sex abuse.  (The eight video files include the original file identified in the initial search and reference in paragraph 31 above.) Detective Bock viewed the titles of the remaining video files and found that most (if not all) had file names that were suggestive of child pornography, such as:  "little asian girls licking and fingering pussy in 69 pthc hussyfan raygold r@gold st teens petersburg lesbian ls girls ls magazine babyshivid babyj kdquality pedo lolita pretee.mpg" and "(pthc) 6yo babyj - bedtime rape until cum private pedo child girl 1yo 2yo 3yo 4yo 5yo 6yo 7yo 8yo 9yo 10yo vicky laura jenny sofie fdsa hussyfan russian korea.mpg.

34.   Further investigation revealed that IP address 96.241.5.178 is associated with a Verizon online account.  The subscriber to the Verizon account associated with IP address 96.241.5.178 was identified as Roymer Tejeda, and the account address associated with the IP

address is xxxx Missouri Avenue, NW, Apartment xxx, Washington, DC.   A search of law enforcement databases revealed that Roymer Tejada is a real individual.  These databases provided Tejeda's address as xxxx Missouri Avenue, NW, Apartment xxx, Washington, DC.

35.  On September 10, 2008, I received information from a United States Postal Inspection Service (USPIS) agent, who advised that an individual named Roymer Tejada  currently receives mail at xxxx Missouri Avenue, NW, Apartment xxx, Washington, DC.  The USPIS agent also advised that Roymer Tejada had been receiving mail at that address for at least the past two months. I also learned that Roymer Tejada has relatives living at xxxx Missouri Avenue, NW, Apartment xxx, Washington, DC, and that Roymer Tejada used to receive mail at that address.

## METHODS TO BE USED TO SEIZE AND SEARCH
## COMPUTERS AND COMPUTER-RELATED EQUIPMENT
## IN THE PREMISES

36.    Based upon my training, experience, and information related to me by agents and others involved in the forensic examination of computers and other electronic media, I know that electronic data can be stored on a variety of systems and storage devices including hard disk drives, floppy disks, compact disks, magnetic tapes, and memory chips.   I also know that searching computerized information for evidence or instrumentalities of a crime commonly requires agents to seize most or all of a computer system's input/output peripheral devices, related software documentation, and data security devices (including passwords), so that a qualified computer expert can accurately retrieve data from the system or phone in a laboratory or other controlled environment.  This is true for the following reasons:

a.    Searching computer systems is a highly technical process which requires specific expertise and specialized equipment.  There are so many types of computer hardware and

software in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search.  In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer, software application, or operating system that is being searched.

b.       Searching computer systems requires the use of precise, scientific procedures which are designed to maintain the integrity of the evidence and to recover "hidden," erased, compressed, encrypted, or password-protected data.  Computer hardware and storage devices may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Since computer data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted.

c.       The volume of data stored on many computer systems and storage devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of the PREMISES.  A single megabyte of storage space is the equivalent of 500 double-spaced pages of text.  A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text.  Storage devices capable of storing up to 100 gigabytes of data are now commonplace in desktop computers.  Consequently, each non-networked, desktop computer found during a search can easily contain the equivalent of millions of pages of data.

d.       Computer users can attempt to conceal data within computer equipment and storage devices through a number of methods, including the use of innocuous or misleading

17

filenames and extensions.  For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text.  Computer users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form.  In addition, computer users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography."  For example, by using steganography a computer user can conceal text in an image file which cannot be viewed when the image file is opened.  Therefore, a substantial amount of time is necessary to extract and sort through data that is concealed or encrypted to determine whether it is evidence, contraband, or instrumentalities of a crime.

37.     In searching for data capable of being read, stored, or interpreted by a computer, law enforcement personnel executing the applicable Search Warrant will employ the following procedure:

a.     Upon securing the PREMISES, law enforcement personnel trained in searching and seizing computer data (the "computer personnel") will search and seize any computers, computer equipment, and storage devices and transport these items to an appropriate law enforcement laboratory for review as to whether these items contain contraband.  Because of the lengthy period of time necessary to perform a complete search of all material contained in any computers, computer equipment and storage devices, it would not be feasible to conduct this search on the PREMISES, and seizure is necessary so that the preservation of data is not jeopardized.  The computers, computer equipment and storage devices will be reviewed by appropriately trained personnel in order to extract and seize any data that falls within the list of items to be seized set forth

18

herein.

b.      If upon the search of the computers, computer equipment, and storage devices it is determined that the computers, computer equipment, and storage devices do not contain contraband, an instrumentality of the offense, a fruit of the criminal activity, or evidence of the offense specified above, then the computer personnel will return the cell phones, computer equipment and storage devices to the PREMISES.

c.      The analysis of electronically stored data may entail any or all of several different techniques.  Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files); "opening" or reading the first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic "key-word" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.

31.     Any data that is encrypted and unreadable will not be returned unless law enforcement personnel have determined that the data is not (i) an instrumentality of the offense, (ii) a fruit of the criminal activity, (iii) contraband, (iv) otherwise unlawfully possessed, or (v) evidence of the offense specified above.

38.     In searching the data, the computer personnel may examine all of the data contained in the cell phones, computers, computer equipment and storage devices to view their precise contents and determine whether the data falls within the items to be seized as set forth herein.  In addition,

the computer personnel may search for and attempt to recover "deleted," "hidden," or encrypted data

to determine whether the data falls within the list of items to be seized as set forth in this affidavit.

39.     If the computer personnel determine that the cell phones, computers, computer

equipment and storage devices are no longer necessary to retrieve and preserve the data, and the

items are not subject to seizure pursuant to Federal Rule of Criminal Procedure 41(b), the

Government will return these items.

40.     In order to search for data from computers, computer equipment and storage devices,

law enforcement personnel will need to seize and search the following items, subject to the

procedures set forth above:

    a.     any computers, computer equipment, and storage device capable of being used

to commit, further or store evidence of the offense listed above;

    b.     any computers and computer equipment used to facilitate the transmission,

creation, display, encoding or storage of data, including word processing equipment, modems,

docking stations, monitors, printers, plotters, encryption devices, and optical scanners;

    c.     any magnetic, electronic, or optical storage device capable of storing data,

such as floppy disks, hard disks, tapes, CD-ROMs, CD-R, CD-RWs, DVDs, optical disks, printer

or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic

notebooks, personal digital assistants, cameras, and videocameras;

    d.     any documentation, operating logs, and reference manuals regarding the

operation of the computer equipment, storage devices, or software;

    e.     any applications, utility programs, compilers, interpreters, and other software

used to facilitate direct or indirect communication with the computer hardware, storage devices, or

data to be searched;

       f.     any physical keys, encryption devices, dongles, and similar physical items that are necessary to gain access to the computer equipment, storage devices, or data; and

       g.     any passwords, password files, test keys, encryption codes, or other information necessary to access the cell phones, computer equipment, storage devices, or data.

41.     In addition, law enforcement personnel will need to seize and search any device that can capture or store a photographic or video image.

42.     I am familiar with and understand the implications of the Privacy Protection Act ("PPA"), 42 U.S.C. § 2000aa, and the role of this statute in protecting First Amendment activities. I am not aware that any of the materials to be searched and seized from the SUBJECT PREMISES are protected materials pursuant to the PPA.  If any such protected materials are inadvertently seized, all efforts will be made to return these materials to their authors as quickly as possible.

## CONCLUSION

43.     Based on the above information, there is probable cause to believe that an individual residing at the Subject Premises used a computer connected to the Internet from the Subject Premises to violate 18 U.S.C. § 2252A, which, among other things, make it a federal crime for any person to knowingly receive, distribute or possess child pornography.

44.     Given the propensity of child pornography collectors to maintain and increase the number of images in their collections, I  believe that evidence, fruits and instrumentalities of violations of Title 18, United States Code, Sections 2252A(a)(2)and (a)(5), listed in Attachment A to this Affidavit, which is incorporated herein by reference, are concealed at the PREMISES.  Rule 41 of the Federal Rules of Criminal Procedure authorizes the government to seize and retain

evidence and instrumentalities of a crime for a reasonable time, and to examine, analyze, and test them.

45.   Based upon my knowledge, training and experience, and consultations with law enforcement experts, I know that searching and seizing information from computers often requires agents to seize most or all electronic storage devices (along with related peripherals) to be searched later by a qualified computer expert in a laboratory or other controlled environment.

46.     I , therefore, respectfully requests that the attached warrant be issued authorizing the search and seizure of the items listed in Attachment A.


_____
Detective Timothy Palchak
Metropolitan Police Department
Internet Crimes Against Children Task Force



Sworn and subscribed before me
this ____ day of September, 2008.


_____
John M. Facciola
United States Magistrate Judge

22